*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

BTW, a legally incapacitated person, by Conservator
DARREN FINDLING,

        Plaintiff-Appellee,

v

CITY OF DETROIT,

        Defendant-Appellant,

and

JAMES DERRICK PENNINGTON,

        Defendant.

UNPUBLISHED
January 14, 2026
11:48 AM

Nos. 367753; 369354
Wayne Circuit Court
LC No. 15-012410-NF

Before: BOONSTRA, P.J., and O'BRIEN and YOUNG, JJ.

PER CURIAM.

In Docket No. 367753, defendant city of Detroit (the City) appeals as of right a jury's finding in favor of plaintiff, BTW, by Conservator Darren Findling, on plaintiff's claim of negligent operation of a motor vehicle under the motor vehicle exception to governmental immunity. In Docket No. 369354, the City appeals as of right a January 8, 2024 order awarding plaintiff case-evaluation sanctions. The appeals were consolidated.[1]

This case arose after BTW was hit and injured by a tire that fell off a van being driven by the City's employee, James Derrick Pennington. The tire fell off the van because the lug nuts affixing the tire to the van were either not properly secured or there simply were no lug nuts securing the tire to the van. Before trial, plaintiff's proposed expert, Timothy Robbins, averred

---

[1] *BTW v Detroit*, unpublished order of the Court of Appeals, entered December 17, 2024 (Docket Nos. 367753 and 369354).

that Pennington would have known that something was wrong with the van's tire before it fell off because, while driving, Pennington would have felt the van's tire wobbling. Robbins' affidavit did not explain how he arrived at this opinion, so the City objected to his proposed testimony and asked the trial court to hold a *Daubert*[2] hearing to assess the reliability of Robbins' contested opinion. The trial court refused to hold a *Daubert* hearing, instead agreeing with plaintiff's counsel that it was "fair" to admit Robbins' contested opinion testimony because the City would have its own expert offering a different opinion, and the parties could cross examine the other's expert.

At trial, Robbins testified over the City's objections that Pennington would have noticed that something was wrong with the van's tire before it fell off because, while driving, Pennington would have heard the tire rubbing against the van and felt the tire wobbling. When pressed on cross-examination as to the basis of his opinion, Robbins admitted that his opinion was not based on any testing of the type of van that Pennington was driving, nor had he taken measurements of the van to know how deep its wheel well was or how much the tire could have been wobbling. Robbins claimed, however, that he did not need this information to form his opinion because Robbins had once driven a different vehicle that had a tire with loose lug nuts, so he could say from personal experience what Pennington would have experienced driving the van in this case.

Robbins' opinion that Pennington would have noticed something was wrong with the van's tire before it fell off plainly failed to meet the reliability requirements of MRE 702. The trial court failed to properly assess the reliability of Robbins' opinion testimony before trial, then abused its discretion by allowing Robbins' unreliable expert testimony to be heard by the jury at trial. This error was not harmless because plaintiff's counsel repeatedly referenced Robbins' improperly-admitted expert testimony during closing, plaintiff's counsel explicitly argued to the jury that it could find the City negligent if it credited Robbins' improperly-admitted testimony, the erroneously-admitted testimony went to the heart of the City's defense that Pennington did not have notice that anything was wrong with the van's tire before it fell off, and the jury's verdict form did not differentiate between plaintiff's theory of liability that relied upon Robbins' improper testimony and plaintiff's other theories of liability. Our conclusion is also bolstered by other errors made by the trial court, namely its decision to allow plaintiff to show a UD-10 report to the jury over the City's objection, and the court's refusal to allow defendant to present to the jury surveillance video of BTW and have the private investigator who took the video testify. Accordingly, in Docket No. 367753, we vacate the judgment against the City and remand for a new trial, and in Docket No. 369354, we vacate the case-evaluation sanctions.

## I. BACKGROUND

This case has been the subject of multiple appeals. In the first appeal, this Court summarized the basic facts of the case as follows:

> On July 3, 2015, [BTW] was crossing the street at the intersection of Rosa Parks Boulevard and West Grand Boulevard in Detroit when he heard something. He testified that he turned toward the sound and saw a tire about a foot away from him. He added that he tried to stop it, but the next thing he recalled was waking up

---

[2] *Daubert v Merrell Dow Pharm, Inc*, 509 US 579; 113 S Ct 2786; 125 L Ed 2d 469 (1993).

in the hospital. It is undisputed that, as a result of being struck by the tire, [BTW] sustained significant bodily injuries. It is further undisputed that the tire came off a van owned by the city of Detroit that was being operated by Pennington. Pennington testified that he had been driving about 20 to 25 miles per hour down Rosa Parks Boulevard when the left rear tire came off. He stated that he felt a "jolt" when he lost the tire, then coasted to a stop, parked his vehicle, and went to investigate where the tire went. The authorities were contacted after he saw [BTW] lying on the ground. [*Wood v City of Detroit*, 323 Mich App 416, 418; 917 NW2d 709 (2018) (*Wood I*).]

The City argued in *Wood I* that there was no issue of material fact that Pennington's operation of the van was not negligent. This Court disagreed, holding that there was a question of fact whether Pennington's operation of the van was negligent based in part on Robbins' affidavit in which he averred that Pennington would have known that something was wrong with the van's tire while driving the van because Pennington would have felt the van wobbling. *Id*. at 421-423.

The case then returned to the trial court, where plaintiff added 17 new defendants. This led the City to file another motion for summary disposition in which it argued in relevant part that Robbins' opinion that Pennington would have noticed that something was wrong with the van's tire while driving the van was inadmissible. The trial court rejected this argument, reasoning that the *Wood I* Court "implicitly ruled that" Robbins' contested opinion was admissible. The City appealed, and this Court agreed with the trial court, concluding that "implicit in the *Wood I* decision is a conclusion that Robbins's expert opinion was admissible because it met the requirements of MRE 702 and MCL 600.2955." *Wood v Detroit*, unpublished per curiam opinion of the Court of Appeals, issued August 12, 2021 (Docket Nos. 353611 and 353653) (*Wood II*), vacated in part and remanded 509 Mich 864 (2022), p 7. The *Wood II* Court held that it was bound by this ruling because it was the law of the case. *Id*.

The City appealed, and our Supreme Court vacated this portion of *Wood II* and remanded the case for reconsideration in light of *Rott v Rott*, 508 Mich 274; 972 NW2d 789 (2021). See *Wood v Detroit*, 509 Mich 864, 864 (2022) (*Wood III*).

On remand, this Court explained that *Rott* held that the law-of-the-case doctrine did not apply to issues that "were presumed without mention but not decided in an interlocutory appeal." *Wood v Detroit (On Remand)*, unpublished per curiam opinion of the Court of Appeals, issued November 3, 2022 (Docket Nos. 353611 and 353653) (*Wood IV*), p 6, quoting *Rott*, 508 Mich at 288 (quotation marks omitted). The panel therefore concluded that it had erroneously relied on an implicit holding from *Wood I* to conclude that Robbins' affidavit was admissible, and the panel was required to give the City's argument on that issue "independent consideration." *Wood IV*, unpub op at 6.

Doing so, the panel explained that, while the City cited to MRE 702 and MCL 600.2955 when arguing that Robbins' affidavit should be stricken, the City's argument was "merely" that the affidavit "was deficient." *Id*. at 6-7. The City argued that this was so because Robbins' opinion ignored what Pennington said he experienced before the tire fell off, but the panel explained that this was not necessarily improper so long as Robbins was properly qualified as an expert. *Id*. at 7. The panel added that Pennington's testimony that he did not hear anything before the van's tire

fell off did not entitle the City to a grant of summary disposition because "Pennington's testimony was still subject to a credibility determination by the trier of fact." *Id.* The City alternatively argued that Robbins' affidavit should be stricken because Dr. Jerome Eck's competing expert opinion established that Robbins' opinion was incorrect. The panel rejected this argument too, explaining that Eck having a different opinion of the evidence was "not a basis to strike Robbins's affidavit." *Id.* at 8. The panel added, however, that "[w]hether Robbins's opinion would meet the standards set forth in *Daubert* presents a different question for which defendants did not request a hearing." *Id.*

On remand in the trial court, the City moved for the trial court to either strike Robbins' testimony about what Pennington would have perceived while driving the van because it was unreliable under MRE 702 and MCL 600.2955, or to hold a *Daubert* hearing to determine the reliability of Robbins' opinion on this point. In support of its argument, the City recited the relevant standards for determining reliability under MRE 702 and MCL 600.2955, recited Robbins' opinion as stated in his affidavit, then argued that Robbins' opinion that Pennington would have felt or heard the tire wobbling while driving the van was unreliable because it failed to meet the requirements of MRE 702 and MCL 600.2955.

The City also moved to strike a number of plaintiff's other proposed witnesses, and plaintiff moved to strike Eck and a host of the City's other proposed witnesses, including a "metallurgist."

The trial court held a combined hearing on all of these and other motions. At that hearing, plaintiff's counsel argued that "a fair resolution" of the parties' competing motions to disqualify Robbins and Eck was to allow both witnesses to testify and be cross examined. By the same token, plaintiff's counsel argued that the court should not allow the City's metallurgist to testify because it would be unfair to plaintiff, as plaintiff had not hired his own metallurgist, and he would not have time to do so before trial. The trial court agreed with plaintiff's arguments and permitted Robbins and Eck to testify but struck the City's metallurgist. The court never explained why Robbins' contested testimony was reliable, nor did the court address any of the City's arguments as to why Robbins' opinion was unreliable. The court also failed to explain why it was rejecting the City's request for a *Daubert* hearing or why such a hearing was unnecessary.

During plaintiff's direct examination of Robbins at trial, plaintiff's counsel asked Robbins whether Pennington could have done anything to avoid the tire coming off the van, assuming that there were no lug nuts affixing the tire to the van. The City objected to this question, arguing that Robbins had not explained how he could arrive at an answer to that question, so any answer he gave would be speculative. Plaintiff's counsel responded that Robbins "[was] an expert," but the trial court asked that he "lay a foundation." So, plaintiff's counsel asked Robbins what experience he had "to comment on predictable consequences of failing to affix the lug nuts" to a tire, and Robbins said he knew what would happen "because I've had it personally happen." The City's counsel contended that this was insufficient and renewed his objection. Plaintiff's counsel said in response that Robbins had "laid a foundation" and "[t]his is his whole opinion." The trial court agreed with plaintiff and overruled the City's objection. Robbins then testified that, if lug nuts were not affixed to the tire, he "would expect two things to happen"—the driver would feel the tire wobbling, and he would be able to hear that the tire was loose. Robbins said, "I expect you're going to have one or both of these occurrences. You're going to audibly hear it and/or feel it or both."

-4-

Plaintiff's counsel then asked Robbins questions about photos that showed markings on the inside of the tire that fell off the van and hit BTW, and Robbins explained that the markings on the inside of the tire showed "something rubbed there." Plaintiff's counsel then asked, "So would that cause notice to the driver," to which the City again objected on the same grounds as before. Plaintiff's counsel again responded, "This is [Robbins'] whole opinion," and the trial court again overruled the City's objection. Robbins then testified again that he "would expect [the driver] would hear that or feel it as well." Robbins further testified—again over the City's objection—that he believed that there would have been warning signs that would have alerted Pennington that something was wrong with the van's tire before it came off.

During cross examination, Robbins admitted that he had never inspected a van like the one Pennington was driving in this case,[3] nor had he run any tests with such a van. Robbins more specifically admitted that he had not actually tested whether a tire without lug nuts on a van like Pennington was driving would make contact with the van while it was moving. Robbins further admitted that he had not taken any measurements of the type of van that Pennington was driving, so he could not say how much a tire without lug nuts affixing it to the vehicle would wobble while the van was moving, nor could he say how deep the van's wheel well was. Robbins also agreed that his conclusion that the inside of the tire rubbed against the van was not based on any testing he performed or any measurements he took, but was based on his review of a photo of the tire.

As the City continued to pursue this line of questioning, Robbins eventually stopped the City's counsel, saying that it "would be much easier if I simply said I didn't measure anything for any of the components that are here or the Ford van" that Pennington was driving, and "the only appropriate testing would be to take the van out and test" it, but "I didn't do any of that." Robbins also admitted that he did not "do any audio testing" in the type of van that Pennington was driving to determine whether Pennington could have heard a tire rubbing against the wheel well. The City also asked Robbins about the personal experience he had driving a vehicle that had a tire affixed with loose lug nuts, and Robbins testified that the vehicle was a different make and model than the one that Pennington was driving. Robbins further testified that he only knew "what [he] experienced" driving a vehicle that had a tire with loose lug nuts, and he "did not test" or try to recreate "the same conditions" that Pennington experienced while driving the van at issue in this case.

During closing arguments, plaintiff's counsel repeatedly relied on Robbins' testimony to argue that Pennington knew that something was wrong with the van's tire while he was driving it because the van "would have been wobbly" and "there would have been a clucking [sic] sound." Plaintiff's counsel further argued that the jury could find the City liable if it credited any one of plaintiff's theories, including that Pennington "heard the lug nuts clunking" or "felt the rumble" while driving the van. For its part, one of the City's main defenses was that Pennington was not negligent because he did not know that there was anything wrong with the van's tire before it fell off, and the City's counsel essentially argued that the jury should disregard Robbins' testimony

---

[3] The actual van that Pennington was driving when the accident occurred was not available by the time Robbins requested to inspect it, and the jury was instructed that it could make an adverse inference against the City due to this loss of evidence.

because it was unreliable. The jury ultimately delivered a verdict in favor of plaintiff. The jury's verdict form asked, "Was a City of Detroit employee negligent in the operating of the subject vehicle," and the jury answered "yes."

The City moved for a new trial or judgment not withstanding the verdict, arguing in relevant part that Robbins' opinion that Pennington would have noticed that something was wrong with the van's tire while driving the van before the tire fell off was unreliable and should have been excluded. The trial court rejected this argument, explaining, "There were cross motions on this to exclude both Plaintiff and Defendant's experts. The Court heard oral arguments on this issue. And the Court ruled on both of these that the, and both motions that both experts would be allowed to testify."

This appeal followed.

## II. ROBBINS' EXPERT TESTIMONY

The City argues that the trial court abused its discretion by denying the City's request for a *Daubert* hearing to determine the reliability of Robbins' opinion that Pennington would have known that something was wrong with the van's tire while driving the van, and that the court further abused its discretion by permitting Robbins to testify to this opinion at trial because it failed to meet the reliability requirements of MRE 702 and MCL 600.2955. We agree.

## A. STANDARD OF REVIEW

A trial court's refusal to hold a *Daubert* hearing is reviewed for an abuse of discretion. *Lenawee Co v Wagley*, 301 Mich App 134, 162; 836 NW2d 193 (2013). A trial court's decision to admit evidence is likewise reviewed for an abuse of discretion. *Edry v Adelman*, 486 Mich 634, 639; 786 NW2d 567 (2010). "An abuse of discretion occurs when the trial court chooses an outcome falling outside the range of principled outcomes." *Id*. Questions of law underlying evidentiary rulings—including the proper interpretation and application of statutes and court rules—are reviewed de novo. *Elher v Misra*, 499 Mich 11, 21; 878 NW2d 790 (2016). If a trial court misinterprets or misapplies the law to admit inadmissible evidence, then the court necessarily abused its discretion. *Gay v Select Specialty Hosp*, 295 Mich App 284, 292; 813 NW2d 354 (2012).

## B. ANALYSIS

Plaintiff sought to hold the City liable for BTW's injuries under the motor vehicle exception to governmental immunity in MCL 691.1405. That exception provides that a governmental entity like the City can be held "liable for bodily injury and property damage resulting from the negligent operation" of a motor vehicle that the governmental entity owns. MCL 691.1405. This requires proving ordinary negligence. See *Alex v Wildfong*, 460 Mich 10, 17; 594 NW2d 469 (1999). A claim of negligence consists of "four elements: (1) duty, (2) breach of the duty, (3) causation, and (4) damages." *Seldon v Suburban Mobility Auth for Regional Transp*, 297 Mich App 427, 433; 824 NW2d 318 (2012).

Plaintiff argued that Pennington's operation of the van in this case was negligent in several ways, including because he should have done a pre-trip inspection and noticed that something was wrong with the van's tire before driving it but failed to do so, and because Pennington violated a statute when he operated the van in the condition that it was in.  Plaintiff alternatively argued that Pennington's operation of the van was negligent because, while driving the van, Pennington would have known that something was wrong with the van's tire but continued driving the van any way.  In support of this latter theory, plaintiff relied on Robbins' testimony that Pennington would have heard the van's tire hitting the van or felt the tire wobbling while driving the van.

As explained above, the City objected to this portion of Robbins' proposed testimony before trial on grounds that it failed to meet the reliability requirements for expert testimony established by MRE 702 and MCL 600.2955.  At the time of trial, MRE 702 provided:

> If the court determines that scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

And MCL 600.2955(1) provides:

> In an action for the death of a person or for injury to a person or property, a scientific opinion rendered by an otherwise qualified expert is not admissible unless the court determines that the opinion is reliable and will assist the trier of fact.  In making that determination, the court shall examine the opinion and the basis for the opinion, which basis includes the facts, technique, methodology, and reasoning relied on by the expert, and shall consider all of the following factors:
>
> (a) Whether the opinion and its basis have been subjected to scientific testing and replication.
>
> (b) Whether the opinion and its basis have been subjected to peer review publication.
>
> (c) The existence and maintenance of generally accepted standards governing the application and interpretation of a methodology or technique and whether the opinion and its basis are consistent with those standards.
>
> (d) The known or potential error rate of the opinion and its basis.
>
> (e) The degree to which the opinion and its basis are generally accepted within the relevant expert community.  As used in this subdivision, "relevant expert community" means individuals who are knowledgeable in the field of study and are gainfully employed applying that knowledge on the free market.

(f) Whether the basis for the opinion is reliable and whether experts in that field would rely on the same basis to reach the type of opinion being proffered.

(g) Whether the opinion or methodology is relied upon by experts outside of the context of litigation.

When the City objected to Robbins' testimony that Pennington would have noticed that something was wrong with the van's tire while driving the van, it asked the trial court to either rule that the testimony was inadmissible or hold a *Daubert* hearing to assess the reliability of Robbins' opinion. "A *Daubert* hearing is a pretrial hearing conducted by a trial court in exercising its role as a gatekeeper to ensure that evidence that is admitted into trial meets reliability characteristics outlined in MRE 702." *People v Warner*, 514 Mich 41, 52 n 3; 22 NW3d 1 (2024). "This gatekeeper role applies to *all stages* of expert analysis," meaning that the court must conduct "a searching inquiry, not just of the data underlying expert testimony, but also of the manner in which the expert interprets and extrapolates from those data." *Gilbert v DaimlerChrysler Corp*, 470 Mich 749, 782; 685 NW2d 391 (2004). A "court *must* evaluate expert testimony under MRE 702 once that issue is raised." *Craig ex rel Craig v Oakwood Hosp*, 471 Mich 67, 82; 684 NW2d 296 (2004). "Under MRE 702, it is generally not sufficient to simply point to an expert's experience and background to argue that the expert's opinion is reliable and, therefore, admissible." *Edry v Adelman*, 486 Mich 634, 642; 786 NW2d 567 (2010). The reliability inquiry focuses "solely on principles and methodology, not on the conclusions that they generate." *People v Lemons*, 514 Mich 485, 504; 22 NW3d 42 (2024) (quotation marks and citation omitted).

In Robbins' affidavit, he stated that he reviewed photos of the tire that hit BTW and noted "chaffing [sic] marks on the inside of the tire" that, according to Robbins, "show that [the tire] was striking or rubbing on structures inside the wheel well" before it fell off. He further opined that "[t]he extent of chaffing [sic] and scarring to the tire . . . demonstrates [that Pennington] would likely have experienced significant wobbling" while driving the van with the tire affixed to it. The City argued that Robbins' opinion that Pennington would have felt that something was wrong with the van's tire was not based on any testing; Robbins had not identified what methodology or technique he used to generate his opinion that Pennington would have felt that something was wrong with the van's tire after simply reviewing photos showing marks on the tire; Robbins had not identified any potential error rate for his opinion; Robbins had not identified any standards governing the methodology upon which he relied; Robbins had not claimed that the methodology he used to form his opinion was generally accepted in the relevant expert community; Robbins had "not addressed whether the bases for his opinions [were] reliable or whether experts in the field of accident reconstruction would rely on the same bases to reach similar opinions"; and nothing suggested that "opinions or methodology like [Robbins'] is relied upon by experts outside of the context of litigation."

Faced with the City's objection to the reliability of Robbins' opinion, the trial court was obligated to evaluate the contested testimony. See *Craig*, 471 Mich at 82. That is, the City's objection required the trial court to exercise its role as gatekeeper to ensure that Robbins' testimony met the "reliability characteristics outlined in MRE 702." *Warner*, 514 Mich at 52 n 3. To do this, the trial court could not look merely to Robbins' experience and background, see *Edry*, 486 Mich at 642, but had to examine the "principles and methodology" upon which Robbins relied to form his opinion, *Lemons*, 514 Mich at 504.

The trial court failed in its role as gatekeeper. Instead of assessing the reliability of Robbins' testimony, the trial court agreed with plaintiff's counsel that it was "fair" to admit Robbins' contested testimony because the City would have its own expert offering a different opinion, and the City could cross-examine Robbins. But MRE 702 is not necessarily concerned with fairness; it is concerned with whether an expert's opinion is reliable. And neither the fact that the City would have its own expert to rebut Robbins' testimony nor the fact that the City would be able to cross-examine Robbins tended to make Robbins' testimony independently reliable. Without further explanation as to why the trial court believed that Robbins' contested testimony was reliable such that holding a *Daubert* hearing was unnecessary, we conclude that the trial court abused its discretion by denying the City's request for *Daubert* hearing.

This error led to the jury hearing Robbins' testimony that Pennington would have either felt or heard that something was wrong with the van's tire before it fell off and hit BTW. The City objected each time plaintiff sought to introduce this testimony, arguing that it was speculative, i.e., that Robbins' opinion on this point was not based on sufficient facts or data, nor was it based on sound principles or methods. But the trial court overruled the City's objection every time. So, on cross-examination, the City explored what facts or data Robbins relied on—and what principles and methods he used—to form his opinion that Pennington would have felt or heard that something was wrong with the van's tire while driving the van. Robbins answers to the City's cross-examination demonstrated that his opinion that Pennington would have noticed that something was wrong with the van's tire while driving the van was not reliable.

Robbins admitted that he had not conducted any tests with the type of van that Pennington was driving, so he had not actually tested whether a tire without lug nuts affixing it to the type of van that Pennington was driving would hit the wheel well. In fact, Robbins admitted that he had not even taken any measurements of the type of van that Pennington was driving, so he could not say how much a tire without lug nuts on such a van may have been wobbling or how deep the van's wheel well was. And without these measurements, Robbins was obviously unable to say whether a tire on such a van even could wobble enough to hit the wheel well. Robbins also admitted that he did not "do any audio testing" of the type of van that Pennington was driving. It follows that even if a wobbling tire on the van could come into contact with another part of the van, Robbins had not done any tests or taken any measurements to determine whether the driver of the van would be able to hear that contact. In Robbins words, "the only appropriate testing" he could have done to determine what Pennington would have experienced while driving the van in the condition that it was in was "to take the van out and test" it in the conditions that Pennington was driving in before the tire fell off, but Robbins "didn't do any of that." While Robbins did not *need* to run tests using the type of van Pennington was driving to form his opinion, he at least needed facts or data sufficient to show that a tire without lug nuts on the type of van that Pennington was driving could make contact with the van while it was being driven, then he needed to explain what principles or methodologies he relied on to conclude that Pennington would have been able to feel and hear that contact while driving the van.

Robbins based his opinion that Pennington would have noticed the van's tire wobbling and heard the tire hitting the van on (1) photos of the tire that hit BTW showing "chaffing [sic] marks" on the inside of the tire and (2) Robbins' personal experience driving a vehicle that had a tire without lug nuts securing it to the vehicle.

Addressing the photos first, they indeed show chafing marks on the tire, demonstrating that the inside of the tire rubbed against something. But Robbins did not explain how he reached his conclusion that the chafing marks on the inside of the tire were caused by the tire coming into contact with the van. Again, Robbins did not take any measurements of the type of van that Pennington was driving or do any tests with such a van, so Robbins could not say that a tire without lug nuts affixed to such a van could even wobble enough to come into contact with the van while it was moving and cause chafing marks. Nor did Robbins say that he had reviewed many tires that had chafing marks from rubbing against a vehicle so that he could opine from personal experience what such chafing marks would look like. Robbins instead merely noted that there were chafing marks on the tire and opined that they came from rubbing against the van.

But even if it was permissible for Robbins to testify that the chafing marks on the tire in the photos were caused by the tire coming into contact with the van, Robbins' claim that "[t]he extent of chaffing [sic] and scarring to the tire" were such that Pennington would "have experienced significant wobbling" while driving was not reliable. Again, Robbins did not run any tests or take any measurements of the type of van that Pennington was driving, so Robbins could not say how much contact a wobbling tire on such a van would make with the van (assuming the tire could make contact with the van at all). Robbins also failed to identify any principles or methods that would have allowed him to review photos of chafing marks on a tire and then opine about whether the driver of the vehicle to which the tire was affixed would have felt the tire wobbling. Nor did Robbins explain how he applied any such principles or methods to reach his conclusion. Lastly, Robbins never explained how he could conclude that Pennington would have been able to *hear* the van's tire hitting the van based only on his review of photos showing chafing marks on the tire. In short, photos showing chafing marks on the tire that fell off Pennington's van did not, without further explanation, provide a reliable basis for Robbins to opine that Pennington would have felt the tire wobbling and heard the tire hitting the van while driving.

The other basis for Robbins opinion—his personal experience driving a vehicle that had a tire with loose lug nuts—likewise did not provide a reliable basis for Robbins' opinion that Pennington would have heard the loose tire hitting the van and felt the tire wobbling while driving. Robbins only identified one time that he drove a vehicle that had a tire with loose lug nuts, and he testified that the vehicle was a different make and model than the one that Pennington was driving. He further testified that he only knew "what [he] experienced" driving that other vehicle, and he admitted that his experience driving a vehicle that had a tire with loose lug nuts was not "under the same conditions" that Pennington was driving under. Particularly in light of the fact that Robbins' single experience of driving a vehicle that had a tire with loose lug nuts involved a different make and model vehicle than Pennington was driving, Robbins' personal experience did not provide a reliable basis for Robbins to form his opinion about what Pennington would have experienced while driving the van involved in this case. This is especially true when Robbins did not provide any explanation for how he accounted for the differences in the type of vehicle he was driving compared to the one that Pennington was driving, nor did Robbins explain how he accounted for the different conditions that he drove under compared to Pennington. In Robbins words, he only knew "what [he] experienced," and given the differences between Robbins' and Pennington's experiences, Robbins' personal experience of driving a vehicle of a different make

and model under different conditions did not provide a reliable basis for Robbins to opine about what Pennington would have experienced while driving the van in this case.[4]

For these reasons, Robbins' testimony that Pennington would have noticed that something was wrong with the van's tire while driving the van because he would have heard the tire hitting the van or felt the tire wobbling was unreliable under MRE 702, and the trial court abused its discretion by allowing this testimony to be heard by the jury.

The trial court's error in admitting this testimony does not necessarily entitle the City to relief, however. Under MCR 2.613(A), an error in the admission of evidence is only grounds for a new trial if the refusal to take action "appears to the court inconsistent with substantial justice." In practice, this generally means that reversal is required if it is more probable than not that the error was outcome determinative. See *Barnett v Hidalgo*, 478 Mich 151, 172; 732 NW2d 472 (2007).

The parties here clearly understood the importance of Robbins' testimony that Pennington would have felt the van's tire wobbling and heard it hitting the van. The City objected to this testimony multiple times before trial, and reiterated its objection each time plaintiff's counsel attempted to elicit at trial Robbins' testimony that Pennington would have known that something was wrong with the van's tire while driving the van. Notably, twice when the City objected, plaintiff's counsel responded saying, "This is [Robbins'] whole opinion." This suggests that plaintiff's counsel believed—as we do—that Robbins' opinion that Pennington would have had notice that something was wrong with the van's tire while driving the van before the tire fell off was a key piece of evidence supporting one of plaintiff's theories of liability. Indeed, this testimony from Robbins was the only affirmative evidence that plaintiff presented that tended to establish that Pennington would have had notice that something was wrong with the van's tire while driving the van.

That is presumably why plaintiff's counsel repeatedly cited to Robbins' testimony during closing arguments to support plaintiff's argument that Pennington knew that something was wrong with the van's tire while he was driving the van before the tire fell off. Plaintiff's counsel also explicitly told the jury that it could find the City liable if it credited Robbins' testimony on this point.

One of the City's main arguments during closing was that Pennington was not negligent in his operation of the van because he did not know that there was anything wrong with the van's tire before it fell off. When making this argument, the City had to contend with Robbins improperly-admitted testimony that Pennington would have either felt the tire wobbling or heard the tire hitting the van before the tire fell off. To combat this improperly-admitted testimony, the City essentially

---

[4] Experts can, of course, rely on personal experience to testify. See *Lenawee Co v Wagley*, 301 Mich App 134, 163; 836 NW2d 193 (2013). But to do so, the expert must "sufficiently explain[] how his experience led to his opinions." *Id*. at 163-164. Robbins did not offer such an explanation in this case—he merely said what he experienced driving a vehicle that had a tire with loose lug nuts, then opined without explanation that Pennington would have had a similar experience, despite the admitted differences between Robbins' and Pennington's experiences.

had to argue to the jury that Robbins testimony was unreliable. But the City should not have had to make this argument to the jury; it was the trial court's role to act as gatekeeper and determine the reliability of Robbins' contested testimony. Juries are simply not suited to make this determination. By abdicating its role as gatekeeper, the trial court allowed the jury to hear unreliable testimony that went to the heart of one of the City's main arguments, preventing the City from fairly trying its case.

Despite all of this, the trial court's error of admitting Robbins' inadmissible testimony could still possibly be harmless if we could be assured that the jury did not rely on that testimony to reach a verdict for plaintiff. And that is a distinct possibility here because, as explained above, plaintiff presented multiple theories of liability, several of which that did not rely on Robbins' unreliable testimony about whether Pennington would have known that something was wrong with the van's tire while driving the van. The jury's verdict form, however, does not differentiate between any of plaintiff's theories of liability. Instead, the verdict form asked, "Was a City of Detroit employee negligent in the operating of the subject vehicle," to which the jury answered "yes." We therefore simply have no way of knowing whether the jury credited plaintiff's theory of liability that relied on Robbins' unreliable testimony or one of plaintiff's other theories of liability.

We accordingly conclude that allowing the jury's verdict to stand in light of the fact that the jury should not have heard Robbins' inadmissible testimony would be inconsistent with substantial justice. The jury's verdict is therefore vacated, and the case is remanded for a new trial.[5]

## III. OTHER ERRORS

Our conclusion that a new trial is necessary is reinforced by other errors made by the trial court. First, the court erred by allowing plaintiff to use a UD-10 police report during opening statements over the City's objection. Second, the trial court abused its discretion by not allowing the City to present rebuttal evidence in the form of a surveillance video of BTW and the testimony of the private investigator who took the video.

---

[5] We disagree with the City to the extent that it argues that Robbins was simply not qualified to testify as an expert, and insofar as the City disputes the extent of Robbins' expertise, that is an issue for the jury to decide. See *Surman v Surman*, 277 Mich App 287, 309-310; 745 NW2d 802 (2007). We also disagree with the City that it is entitled to judgment notwithstanding the verdict if Robbins' contested testimony is deemed unreliable. As explained above, plaintiff argued that Pennington's operation of the van was negligent in ways that did not rely on Robbins' unreliable testimony. Namely, plaintiff argued that Pennington's operation of the van was negligent because (1) he should have noticed something was wrong with the van before he got into it (this was based on a portion of Robbins' testimony that the City does not contend was inadmissible), and (2) Pennington's operation of the van was per se negligent because it violated a statute.

-12-

## A. UD-10 REPORT

During plaintiff's opening statement, plaintiff's counsel showed the jury a copy of a UD-10 police report that documented the tire hitting BTW. The City objected to plaintiff's use of this report, in response to which plaintiff's counsel claimed that the City had stipulated to admission of the report by not objecting when plaintiff listed "Police Report" as one of "Plaintiff's Exhibits" in the joint pretrial order. The trial court implicitly rejected this argument, and we explicitly do so. A failure to object is not akin to a stipulation, as a stipulation requires an agreement between the parties, and failing to object to something is obviously different than affirmatively agreeing to it. See, e.g., *Black's Law Dictionary*, 12th ed (defining "stipulation" as "[a] voluntary agreement between opposing parties concerning some relevant point; esp., an agreement relating to a proceeding, made by attorneys representing adverse parties to the proceeding"). Plaintiff's counsel alternatively argued that it was too late for the City to object to plaintiff's use of the UD-10 report because plaintiff's counsel was "in the middle of [his] opening," and the trial court agreed with this reasoning, explaining that it would not have allowed the UD-10 report if the City had raised a timely objection, but the City did not do so.

The City did, however, raise a timely objection to plaintiff's use of the UD-10 report. Nothing in the joint pretrial order stated that a party's failure to object to an exhibit listed in the report would render any later objection untimely or waived, so the general rules regarding objections applied. And generally, an objection is timely if it is "contemporaneous" with the alleged error and is made at such a time that would allow "the trial court an opportunity to correct the error." *People v Carines*, 460 Mich 750, 764-765; 597 NW2d 130 (1999) (quotation marks and citation omitted). See also *People v Butsinas*, ___ Mich App ___, ___; ___ NW3d ___ (2025) (Docket No. 364778); slip op at 11 ("For an objection to be timely it must be contemporaneous with the error to provide the trial court an opportunity to correct the error, which could thereby obviate the necessity of further legal proceedings and would be by far the best time to address a defendant's constitutional and nonconstitutional rights.") (quotation marks and citation omitted); *People v Jones*, 468 Mich 345, 355; 662 NW2d 376 (2003) ("The purpose of requiring objections to be timely, see MRE 103(a)(1), is to give the trial court an opportunity to correct the error."). The City objected to plaintiff's counsel's use of the UD-10 report during plaintiff's counsel's opening statement while plaintiff's counsel was making his opening statement. If it was indeed error for plaintiff's counsel to use the UD-10 report during his opening statement, then the City objected at a time when the trial court could correct the error by ordering plaintiff's counsel to not use the report. The City's objection was therefore timely.

And it was indeed error for plaintiff's counsel to use the UD-10 report during trial. MCL 257.624(1) plainly states that such a report "shall not be available for use in a court action." So, plaintiff's counsel's use of the UD-10 during opening statements violated MCL 257.624(1), and the trial court abused its discretion by allowing plaintiff's counsel to use the report over the City's timely objection. See *Gay*, 295 Mich App at 292 (explaining that a trial court necessarily abuses its discretion if it makes an error of law).

## B.  SURVEILLANCE VIDEO

A larger concern is the trial court's refusal to allow the City to present to the jury surveillance video of BTW and have the private investigator who took the video testify.  To understand why this decision amounted to an abuse of discretion, it is necessary to understand the context in which it was made.

On the first day of trial, the City noted that plaintiff did not intend to call BTW as a witness, in response to which plaintiff claimed that appearing at trial would be detrimental to BTW's health, which led the parties to argue about whether the court should declare BTW unavailable.  The trial court cut these arguments short without issuing a ruling.  The next day, the City motioned for the court to order BTW to appear at trial, noting that a ruling that BTW was unavailable to testify would deprive the City of the opportunity to confront BTW.  The City also claimed that BTW's appearance at trial was critical for the jury's assessment of pain and suffering, and the City requested that the court exclude BTW's deposition testimony if he was unavailable to testify.  The trial court ruled on the third day of trial that it was not going to order BTW to testify, and on the fourth day of trial, it denied the City's request to exclude BTW's deposition testimony.[6]

---

[6] At oral argument in this Court, plaintiff's counsel claimed that the City "knew well in advance of this trial that [BTW] was unavailable"; that the City agreed both in the joint pretrial order and during trial to have BTW declared unavailable and to have his deposition testimony read into the record; and that the City only decided that it wanted BTW to testify "as the trial was progressing." None of these assertions are supported by the record.

On May 19, 2023—the Friday before trial was scheduled to begin—plaintiff's counsel received a letter from one of plaintiff's expert witnesses, Dr. Bradley Sewick, in which Sewick said that he was "in receipt of [plaintiff's counsel's] request for [Sewick's] opinion as to whether it would be detrimental for [BTW] to participate in" the upcoming trial, and Sewick opined that it would be.  Also on May 19, the joint final pretrial order was entered.  In that order, plaintiff did not list BTW as a witness, and the City listed BTW's deposition testimony as an exhibit "if [BTW] is unavailable to testify."  Plaintiff objected to this exhibit, and there was no stipulation to the exhibit's admission.

On the first day of trial, before opening statements, the City claimed that it first learned that plaintiff intended to not call BTW as a witness when plaintiff omitted BTW from the joint final pretrial order, and the City said that it was opposed to any ruling declaring BTW unavailable, explaining that it had "evidence that [BTW was] fully capable of testifying."  The trial court cut short these arguments and did not issue any ruling on BTW's availability because plaintiff's counsel insisted that he needed to deliver his opening statement to the jury.

The following day, the City filed its motion asking the trial court to order BTW to appear at trial and to exclude his deposition transcript if he failed to appear, and the court heard argument on the motion.  The City claimed that it did not learn that BTW may be unavailable for trial until it received Sewick's letter on May 19th, and it argued that receiving this notice the Friday before trial was set to begin did not give the City enough time to "assess the availability of [BTW]."  The

The fourth day of trial was a Friday, and during the ensuing weekend, the City obtained surveillance video of BTW. The day before trial was to resume, the City filed an emergency motion to amend its witness list to add the private investigator who took the surveillance video of BTW and to publish the surveillance video to the jury. The surveillance video showed BTW walking to a party store holding (but not using) a cane, and later drinking what appeared to be an alcoholic beverage at an outdoor gathering. The trial court denied the City's motion because the court believed that the surveillance video did not show anything relevant and because the motion came "way too late," as plaintiff had already rested his case.

Addressing the relevancy of the surveillance video first, evidence is relevant if it is material and probative. See *People v Crawford*, 458 Mich 376, 388; 582 NW2d 785 (1998); MRE 401. Evidence is material if it relates to a fact that is "in issue," *Crawford*, 458 Mich at 388, and it "is probative if it tends to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *People v Berklund*, ___ Mich App ___, ___; ___ NW3d ___ (2024) (Docket No. 367568); slip op at 7.

The extent of BTW's pain and suffering, as well as how his injuries affected his ability to live his normal life, were clearly facts "in issue." Because the surveillance video was related to

_____

City also complained that "Plaintiff can't show up the Friday before trial and suddenly it is declared that his client cannot testify [because it] is a fundamental aspect of due process that Defendants can cross examine [what a witness] says under oath and in front of the jury."

The trial court said that it was initially inclined to order BTW to appear at trial, but it was reconsidering that ruling after plaintiff submitted a report from BTW's guardian ad litem (GAL). In that report—which was dated May 12, 2023 (the same day that the GAL was appointed)—the GAL claimed that BTW was "having difficulty with his memory." Both the City's counsel and the trial court said that they had never seen this report before. The court explained that, because the GAL's report may change the court's ruling, the court was going to withhold ruling on BTW's availability until it had fully considered the report. The City then offered to stipulate to BTW being declared unavailable if plaintiff agreed that BTW's "deposition transcript can't come in other than for Defendant's use as a party admission." Plaintiff did not agree to this, and the City said that, without this compromise, it did not "want [BTW] declared unavailable and the deposition testimony read in." The following day, the court ruled that BTW was unavailable to testify, and, the day after that, it ruled that BTW's deposition transcript could be read to the jury.

On this record, it is abundantly clear that the City did not know "well in advance" of trial that BTW would be unavailable—the City first learned that this was even a possibility the Friday before trial was scheduled to begin. It is also clear that the City never agreed to have BTW declared unavailable or to have his deposition testimony read to the jury. The record actually demonstrates that the City staunchly opposed these rulings. Lastly, the City plainly did not wait until trial was unfolding to oppose BTW being declared unavailable. The City learned that plaintiff did not intend to call BTW as a witness the Friday before trial was scheduled to begin, and then, before trial started, the City informed the court that it opposed BTW being declared unavailable and wanted him to testify.

-15-

these facts, the evidence was material. As for the surveillance video's probative value, "the standard for probative force is minimal." *People v Sharpe*, 502 Mich 313, 332; 918 NW2d 504 (2018). *Any* tendency to prove the existence of a material fact "is sufficient probative force." *Crawford*, 458 Mich at 390. Video of BTW appearing to live his normal life is clearly probative of whether BTW's pain and suffering was so severe that it affected his ability to live his normal day-to-day life. This evidence was made significantly more probative by the fact that BTW was permitted to not testify, so the jury never had an opportunity to observe BTW for themselves and assess the credibility and extent of his claims for pain and suffering.

That BTW was permitted to not testify is also pertinent to the trial court's other reason for denying the City's motion—that the motion was untimely. True, the City did not move to amend its witness list and publish the surveillance video until after the fourth day of trial. But the trial court did not rule that BTW did not have to testify until the third day of trial, and the court did not deny the City's request to read BTW's deposition transcript to the jury until the fourth day of trial. It was therefore not until after the fourth day of trial that the City was aware of the fact that the jury would be able to hear from BTW without having the opportunity to personally assess his appearance and credibility. So, after the fourth day of trial, the City went out and obtained surveillance video of BTW, then sought to publish that video to the jury and have the private investigator who took the video testify. It is obvious that the catalyst for the City's belated decision to obtain surveillance video was the trial court's belated decisions related to whether BTW had to appear at trial and whether his deposition transcript would be read to the jury. The City explained this to the trial court, but the court never addressed this aspect of the City's argument; it merely concluded that the City's motion to submit this rebuttal evidence was untimely.[7] While the City's request was certainly last minute, the City explained why—the trial court's last-minute rulings necessitated the City's last-minute filing.

Given this context, we conclude that the trial court abused its discretion by not allowing the City to amend its witness list to add the private investigator who filmed the surveillance video and to publish the surveillance video to the jury. When the court ruled that BTW was unavailable to testify, it removed the jurors' ability to asses BTW for themselves. The City believed that this was important for its case, so it sought to admit surveillance video showing BTW appearing to live his normal day-to-day life so that the jury could assess for itself the credibility and extent of BTW's claimed pain and suffering. Because the trial court's last-minute rulings are what necessitated the City's last-minute request to admit this relevant evidence, it was unreasonable and unprincipled for the trial court to hold the timing of the City's request against the City. Accordingly, the trial court abused its discretion by not allowing the City to amend its witness list and publish to the jury the surveillance video of BTW.

## IV. CONCLUSION

The trial court abused its discretion by admitting Robbins' testimony that Pennington would have noticed that something was wrong with the van's tire while driving the van because that testimony was not based on sufficient facts or data, nor was it the product of reliable principles

---

[7] Curiously, the trial court seemed unbothered by plaintiff's waiting until shortly before trial to request that BTW be declared unavailable and have his deposition transcript read into the record.

-16-

and methods.  The error in admitting this testimony was not harmless because it was the only evidence affirmatively supporting one of plaintiff's theories of liability, plaintiff's counsel repeatedly referenced the inadmissible testimony during closing (including telling the jury that it could find the City liable if it credited Robbins' inadmissible testimony), and the jury's verdict form does not indicate which of plaintiff's theories of liability it credited to deliver a verdict for plaintiff.  This conclusion is bolstered by the fact that the trial court made other errors that prejudiced the City, including when it abused its discretion by allowing plaintiff to use a UD-10 report during his opening statement over the City's timely objection, and when it abused its discretion by refusing to allow the City to present rebuttal evidence that was necessitated by the court's last-minute rulings.  The combination of these errors entitles the City to a new trial.

In Docket No. 367753, the judgment against the City is vacated, and the case is remanded for a new trial.  In Docket No. 369354, we vacate the case-evaluation sanctions.  We do not retain jurisdiction.


/s/ Mark T. Boonstra
/s/ Colleen A. O'Brien
/s/ Adrienne N. Young